JOURNAL ENTRY AND OPINION
{¶ 1} Appellant is the mother of D.B. and D.R. and challenges the decision of the Cuyahoga County Common Pleas Court, Juvenile Division, awarding permanent custody of her children to the Cuyahoga County Department of Children and Family Services ("CCDCFS"). For the reasons that follow, we affirm.
 {¶ 2} It appears from the record that appellant was removed from her mother's home and placed in the temporary custody of CCDCFS when she was approximately 12 years old.[1] Appellant's status with CCDCFS eventually was changed to permanent plan living arrangement ("PPLA"), which appears to allow CCDCFS to provide services and resources that would foster independent living. Nonetheless, appellant was not consistent in remaining at any of the living arrangements provided for her and was absent for extended periods of time without notice to CCDCFS. While still a minor, she became pregnant first with D.B., who was born in August 2000, and, shortly after this child's birth, with D.R., who was born in July 2001. It appears from the record that these children have different fathers. As of the time of the initial dispositional hearing in March 2002, appellant was pregnant with her third child. Appellant turned 18 years old in June 2002.
 {¶ 3} CCDCFS obtained emergency custody of D.B. in February 2001 upon its complaint for dependency and neglect.[2] A parent/child relationship was eventually established between D.B. and the child's father as a result of genetic testing conducted during the course of these proceedings. D.B. was placed in the temporary care of the child's paternal grandparents and remains in their custody to this day. Though duly noticed, D.B.'s father did not attend any hearings nor has he participated in the care or support of D.B. Appellant subsequently admitted to the allegations contained in the complaint as amended and D.B. was adjudicated as a neglected and dependent child.
 {¶ 4} In July 2001, shortly after D.R.'s birth, CCDCFS filed a complaint for dependency seeking emergency custody of D.R., which it obtained. At the hearing that followed, the alleged father of D.R. made an appearance but he did not appear at any further hearings despite being duly noticed. Although ordered to do so, D.R.'s alleged father did not report for the testing required to establish paternity nor has he participated in the care and support of this child. Despite being placed in two previous foster living arrangements since his birth, one that included the sister of appellant, the record supports that D.R. is currently thriving in the most recent placement. As in the case of D.B., appellant admitted to the allegations contained in the complaint as amended and D.R. was adjudicated a dependent child.
 {¶ 5} At the dispositional hearing that followed, the state presented the testimony of a social worker affiliated with CCDCFS responsible for not only appellant's case, but that of her children as well. The substance of her testimony was that appellant's status as PPLA afforded her several opportunities to develop skills for independent living but that appellant failed to take advantage of those opportunities or to follow-through with the recommendations made by the various providers. Although she did testify that appellant completed a 12-week parenting/anger management program, the social worker recommended that appellant repeat the program when she was charged with assaulting a police officer during a high school basketball game. This incident necessitated appellant's suspension and ultimate withdrawal from the high school. Despite recommendations to complete her high school education through a GED equivalency program, appellant has yet to complete the program and has the equivalent of a seventh- or eighth-grade education.[3]
 {¶ 6} The social worker also testified that appellant would leave for extended periods of time without notice to either the facility or foster home in which she was currently placed. Referred to as "absent without leave" or "AWOL," the social worker testified that appellant's AWOL status often interfered with the appointments made by CCDCFS for appellant, including a psychiatric evaluation. These absences also interfered with the supervised visits with D.B. and D.R. arranged by CCDCFS. In the seven- to nine-month time period that these children were fostered, appellant visited with them at the supervised site approximately six to seven times.
 {¶ 7} Also testifying for the state was a clinical supervisor/psychiatric social worker with the Positive Education Program ("PEP"). It was his diagnostic impression that appellant exhibited "Adjustment Disorder with Mixed Disturbance of Emotions and Conduct." He recommended cognitive behavior therapy and participation in "Life Skills for Teens" program. According to his testimony, appellant made no attempts to comply with these recommendations.
 {¶ 8} Testifying on appellant's behalf was her sister, with whom appellant lived for a three-month period when she was pregnant with D.R. and with whom D.R. was fostered for a four-month time period following D.R.'s first foster placement. While she concedes that appellant's living arrangements are tenuous at best, she testified that appellant is a good mother who loves her children and is distressed by these proceedings.
 {¶ 9} Also testifying for appellant was the assistant director of a youth re-entry program. After detailing the program's purpose and services, the assistant director testified that appellant had been in this particular program for a little more than a month but was proceeding satisfactorily. According to her testimony, appellant obtained seasonal employment at an amusement park in an outlying suburb of Cleveland. The assistant director testified that the program does not garnish a participant's paycheck but, on the contrary, teaches the participant the skills necessary to manage his or her funds, such as maintaining a bank account. Nonetheless, the assistant director testified that appellant had yet to establish a bank account despite her employment. Moreover, the assistant director was unsure if appellant was working on her GED or if she was completing the parenting classes.
 {¶ 10} Both the guardian ad litem for appellant and the guardian ad litem for the children gave their recommendations to the court at the close of the hearing. While the guardian ad litem for appellant recommended against permanent custody in favor of giving appellant more time to work her case plan, the guardian ad litem for the children recommended that CCDCFS be granted permanent custody. The latter submitted written recommendations at various intervals throughout these proceedings. His most recent report expressed concerns about appellant's ability to care for her children and stated that the children were thriving in their respective placements. He further stated that both foster parents expressed an interest in providing the children permanent homes through adoption.
 {¶ 11} In its entries journalized July 31, 2002, the trial court terminated the previous order for temporary custody and placed both children in the permanent custody of CCDCFS pursuant to R.C. 2151.353(A)(4) and 2151.414. In particular, the court stated that appellant "has demonstrated a lack of commitment toward the child[ren] by failing to comply with the case plan services and by failing to consistently visit or communicate with the child[ren] when able to do so." Further, that appellant "lacks employment, stable housing or any means to provide adequate care and support for [the children]." The court also stated that appellant lacks maturity and that she has anger management problems that interfere with her ability to care for her children.
 {¶ 12} Appellant is now before this court and complains that the trial court erred in granting permanent custody to CCDCFS.
 {¶ 13} The relevant provisions of R.C. 2151.414 provide that permanent custody may be awarded to an agency if the trial court determines by clear and convincing evidence that it is in the child's best interest and the child cannot or should not be placed with either of the child's parents within a reasonable time. See, also, R.C.2151.353(A)(4).
 {¶ 14} In determining the best interest of the child, R.C.2151.414(D) provides a non-exhaustive list of factors that the court must consider. Relevant to the resolution of this case are the child's (1) interaction and interrelationship with, inter alia, the child's parents, siblings, relatives and foster caregivers; (2) custodial history; and (3) need for legally secure permanent placement and if that type of placement can be obtained without granting permanent custody to CCDCFS. See R.C.2151.414(D).
 {¶ 15} In determining whether a child cannot be placed with either parent within a reasonable period of time, the court must find, also by clear and convincing evidence, that one or more of the factors contained in R.C. 2151.414(E) exist. It appears from the record that the court found subdivisions (E)(1) and (4) relevant. R.C. 2151.414(E)(1) is directed at a parent's failure to remedy the problems leading to the removal of the child from the home while subdivision (E)(4) pertains to a parent's lack of commitment to the child by failing to support, visit or communicate with the child.
 {¶ 16} Considering the relevant factors, the trial court concluded that appellant's interaction with her children had been minimal in that she failed to regularly visit with her children when given the opportunity to do so. It is true that the testimony supported that appellant interacted appropriately with the children during the visits that she has had with the children. Nonetheless, six or seven two-hour visits over a 12-month time period militates against establishing a strong and healthy relationship with the children, especially when appellant had the opportunity to visit more regularly and chose not to do so.
 {¶ 17} On the contrary, the children's interactions and relationships with their current foster caregivers has been exemplary. D.B. has been in the home of her paternal grandparents for most of her young life. According to the child's guardian ad litem, D.B. has adjusted well to the environment, is developing normally and has developed a strong bond with her caregivers, especially the paternal grandmother. The same is true for D.R. While it is true that there were some initial difficulties in the foster placement for this child, his current placement is one in which he is thriving. The guardian ad litem reported that D.R. has bonded well with the caregiver and is developing normally. The foster caregivers have expressed a desire to provide a permanent home for each of the children.
 {¶ 18} The evidence supports that appellant has been given several opportunities to remedy her situation and, again, has only minimally complied. One of the goals of her case plan was to complete her high school education, which she has yet to do. Her frequent and sometimes extended absences have prevented her from keeping diagnostic appointments or following through with other recommendations made by CCDCFS. Despite being in PPLA, she has struggled with maintaining a stable living arrangement or to demonstrate that she can provide adequate housing for not only the children but herself as well. Although it appears that she recently was able to find at least seasonal employment, her employment history does not demonstrate the ability to support herself or her children nor does it appear that she has a plan for gaining or maintaining regular employment.
 {¶ 19} Consequently, we find that there existed clear and convincing evidence justifying the grant of permanent custody to CCDCFS. As stated above, the record is replete with the agency's efforts at implementing its case plan and appellant's lack of compliance with that plan. Her lack of compliance militates against the return of the children to her care within a reasonable time. It was, therefore, in the children's best interest for CCDCFS to have permanent custody.
Judgment affirmed.
KENNETH A. ROCCO, A.J., AND JAMES J. SWEENEY, J., CONCUR
[1] Appellant and four siblings were all removed from the mother's home and placed in the care of relatives or foster parents at this time. According to the testimony of appellant's older sister, it appears that she and her siblings were removed several times over the years but that attempts at reunification followed. The removal of appellant when she was 12 years old, however, eventually became permanent and she was not returned to her mother's or father's care.
[2] The complaint makes reference to an earlier grant of emergency custody to CCDCFS in August 2000. It appears, however, that this order expired and custody was terminated. How long D.B. was in custody initially and when it was terminated is unclear from the record before us.
[3] It appears from the record that appellant left school after the sixth grade. CCDCFS made arrangements for her to complete her education at East High School and she was enrolled in the ninth grade there before her enrollment was terminated shortly after the assault incident.